UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AZADEH KHATIBI, et al.,<br>     Plaintiffs,<br><br>                    v.<br><br>RANDY HAWKINS, et al.,<br>     Defendants. | 2:23-cv-06195-DSF-E<br><br>ORDER GRANTING MOTION<br>TO DISMISS<br><br>(Dkt. 16) |

Defendants move to dismiss Plaintiffs' complaint. Dkt. 16 (Mot.) Plaintiffs oppose. Dkt. 18 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, Defendants' motion is GRANTED.

## I.   Factual Background

California requires that all licensed physicians complete 50 hours of continuing medical education (CME) every two years. Dkt 1 (Compl.) ¶13. In 2019, the California State Legislature enacted Assembly Bill 241. Compl. ¶1. AB 241 requires that as of January 1, 2022, "all continuing medical education courses contain curriculum that includes the understanding of implicit bias." Compl. ¶19. California law requires the Medical Board of California to enforce this mandate. Compl. ¶2.

To satisfy this requirement, courses must include "[e]xamples of how implicit bias affects perceptions and treatment decisions of physicians and surgeons, leading to disparities in health outcomes" or

"[s]trategies to address how unintended biases in decisionmaking may contribute to health care disparities by shaping behavior and producing differences in medical treatment along lines of race, ethnicity, gender identity, sexual orientation, age, socioeconomic status, or other characteristics." Cal. Bus. & Prof. Code § 2190.1(e).

Plaintiffs are doctors and a non-profit corporation whose members include medical professionals and policy makers. Compl. ¶¶28–47. Some have taught and organized CME courses in the past. Compl. ¶¶30, 39, 45. They allege that "there is inconsistent evidence that implicit bias in healthcare is prevalent and results in disparate treatment outcomes." Compl. ¶23. And they are unpersuaded that implicit bias trainings would solve the problem, even if it does exist. Compl. ¶24. Instead, they allege that trainings can cause "counterproductive anger, frustration, and resentment among those taking the trainings." Compl. ¶25. They do not want to include AB 241's required curricula in their future courses. Compl. ¶¶33, 40, 47.

Plaintiffs allege that if they do not teach the state's mandated curriculum, their courses will not qualify for CME credit, and doctors will be unlikely to take them. Compl. ¶¶34, 42. They contend that they have therefore been compelled to include discussion of implicit bias in their courses. Compl. ¶1. They assert this violates the First Amendment, as the government "cannot compel speakers to engage in discussions on subjects they prefer to remain silent about," and "the government cannot condition a speaker's ability to offer courses for credit on the requirement that she espouse the government's favored view on a controversial topic." Compl. ¶2.[1]

Plaintiffs sue the members of the Board in their official capacities. Compl. ¶¶8–12.

---

[1] Whether implicit bias training is controversial, counterproductive, or effective, is not material to the disputed legal issues. The Court takes no position on the merits or effectiveness of implicit bias training.

## II. Legal Standard

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), but is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121 (9th Cir. 2008). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

"A district court shall grant leave to amend freely 'when justice so requires.'" Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001) (quoting FRCP 15). "This policy is to be applied with extreme liberality." Id.

## III. Discussion

### A. Legal Background

Since the nineteenth century, establishing the qualifications required to practice medicine within a state has been deemed a proper exercise of the legislature's police power. See Hawker v. People of New York, 170 U.S. 189, 193 (1898). In Dent v. State of W.Va., 129 U.S. 114, 122 (1889), the Supreme Court upheld educational licensing requirements for medical practitioners because "[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance[.]"

3

Neither party contends that the State of California lacks the power to draft a detailed curriculum that all doctors must complete to renew their licenses. Instead, the legislature has delegated this power to the Medical Board, see Cal. Bus. & Prof. Code § 2004, tasking the Board with "[i]ssuing licenses and certificates" and "[a]dministering [a] continuing medical education program." Id. at §§(h), (i).

Although it does not draft the course curricula, the Board sets out the criteria for its continuing medical education program. This includes the exclusive content areas CME courses may address, which are limited to: "patient care, community health or public health, preventive medicine, quality assurance or improvement, risk management, health facility standards, the legal aspects of clinical medicine, bioethics, professional ethics, or improvement of the physician-patient relationship." Cal. Code Regs. tit. 16, § 1337.5(a)(3). The Board enlists private organizations and institutions to approve for credit the CME courses offered in these content areas. Cal. Code Regs. Tit. 16, § 1337(a).

The Board does not pre-screen these courses. But, either randomly or due to complaint, the Board will audit courses and require the organizer to submit the "(1) Organizer(s) faculty curriculum vitae; (2) Rationale for course; (3) Course content; (4) Educational objectives; (5) Teaching methods; (6) Evidence of evaluation; [and] (7) Attendance records." Cal. Code Regs. tit. 16, § 1337.5(b). After an audit, if the Board determines that a course is unacceptable, credit will not be received by attending physicians. Cal. Code Regs. tit. 16, § 1337.5(c). Plaintiffs do not challenge this structure, or the CME requirement generally.

The legislature found that implicit bias, meaning "the attitudes or internalized stereotypes that affect our perceptions, actions, and decisions in an unconscious manner," was contributing to health disparities across race, gender, and sexual orientation. AB 241, 2019, Cal. State Assemb. (Cal. 2019). The legislature noted, for example, that African American women were three to four times more likely than white women to die from pregnancy-related causes. Id.

4

To address these findings, the legislature sought to "provide specified healing arts licensees with strategies for understanding and reducing the impact of their biases in order to reduce disparate outcomes and ensure that all patients receive fair treatment and quality health care." Id.

**B.     Government Speech**

Defendants argue that the compelled discussion of implicit bias in CME courses does not implicate Plaintiffs' free speech rights because it is government speech.

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 207 (2015). "That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." Id.  But "[t]he boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program." Shurtleff v. City of Boston, Massachusetts, 596 U.S. 243, 252 (2022).

To determine when the government speaks, courts must "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." Id.  That inquiry "is driven by a case's context rather than the rote application of rigid factors." Id.  "[S]everal types of evidence . . . guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." Id. at 244 (citing Walker, 576 U.S. at 209–214).

Plaintiffs argue that the history of the expression weighs in their favor because "how doctors acquire knowledge the state deems essential–including who speaks to them–is left almost entirely to the doctors' discretion." Opp'n at 6.  This argument duplicates Plaintiffs'

5

later conclusion that the government exercises minimal control over the accreditation process of courses and instructors.

In any event, the proper inquiry considers the history of government supervision of licensing requirements for medical practitioners, not California's specific history. See Shurtleff, 596 U.S. at 253. CME is not "as old as human civilization[,]" id., but as noted above, governments have exercised power over educational licensing requirements since at least the nineteenth century. A review of the relevant portion of the Code reveals that the California State Legislature uses CME courses to communicate health concerns to medical practitioners. For example, the legislature requires the Board to "periodically disseminate information and educational material regarding the detection and treatment of spousal or partner abuse." Cal. Bus. & Prof. Code § 2196.5.

However, unlike the monuments in Pleasant Grove City, Utah v. Summum, CME courses are not "designed as a means of expression." 555 U.S. 460, 470 (2009). Governments do not have the same history of using them to communicate to the general public as monuments and flags. See id.; see also Shurtleff, 596 U.S. at 253. Moreover, while monuments and flags communicate to the general public (pedestrians on the street), CME courses are directed to a limited group – medical practitioners.

Plaintiffs have alleged that but for the credits awarded, attendees would not take Plaintiffs' courses. Compl. ¶¶34, 42. Common sense therefore suggests that attendees know CME courses are approved for credits required by the Medical Board of California in order for doctors to maintain their licenses – in other words, the state. However, it is not clear whether attendees are likely to attribute the content of CME courses to the instructor or to the state (the entity that compels their attendance).

Plaintiffs contend that "California exercises almost no control over the content of CMEs." Opp'n at 8. They argue that the lack of control exercised by the legislature and Board distinguishes the CME

curricula from Summum and Walker and is more closely akin to Shurtleff and Matal v. Tam, 582 U.S. 218, 237 (2017) (holding that trademarks are not government speech). However, Plaintiffs plead no factual content to allow the inference that the Board does not exercise control over the content of CME courses. See Iqbal, 556 U.S. at 678. And the Code suggests that the state exercises at least some control over the content of CMEs through audits and public-private partnerships. See Cal. Code Regs. Tit. 16, § 1337(a), 1337.5(b).

The alleged facts are mixed, and do not clearly weigh for one side. However, the Court is not required to tally factors. See Shurtleff, 596 U.S. at 258 (requiring a "holistic inquiry" and holding that flag raising was private speech although two factors weighed in support of government speech).

### C. School Curricula Cases

Defendants argue that educational courses constitute government speech over which states have broad discretion. In the public school context, "the curriculum presented . . . is not the speech of teachers, parents, or students, but that of the [state] government." Nampa Classical Acad. v. Goesling, 447 F. App'x 776, 778 (9th Cir. 2011). This is "not because the school district is a crucial part of the American constitutional design with inherent rights over public school curriculum, but because states authorize the existence of school districts as political subdivisions and delegate to them the state government's authority to run state public schools." Id. at n.2.

Certain "activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 (1988) (holding that school newspaper was part of the curriculum); see also Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003, 1012 (9th Cir. 2000) ("[B]ulletin boards were a manifestation of the school board's policy to promote tolerance, and because [the school]

7

had final authority over the content of the bulletin boards, all speech that occurred on the bulletin boards was the school board's and LAUSD's speech.").

Defendants argue that "the fact that private instructors like Plaintiffs teach the continuing medical education curriculum set by the Legislature and Medical Board does not change the analysis." Mot. at 10. Plaintiffs disagree and contend that their status as private citizens is material. They argue that the school curriculum cases are inapplicable because those cases concern "public entities or public officials" speaking, Opp'n at 11, while Plaintiffs are "private individuals [who] voluntarily teach CME courses to private licensed physicians, under the auspices of private organizations responsible for accrediting the courses, and [are] largely unsupervised by the government except for the broad standards and few mandated inclusions." Opp'n at 12. However, the Court finds the state-mandated requirements for CME courses to be more like public school curricula than monuments, license plates, trademarks, and flags.

"The government may enlist private persons to convey its governmental message, by deputizing private persons as its agents." Sangervasi v. City of San Jose, No. 22-CV-07761-VKD, 2023 WL 3604308, at *4 (N.D. Cal. May 22, 2023). CME instructors speak for the state while teaching courses because they have been delegated the power to bestow credits created and required by the state for the practice of medicine. See Nampa, 447 F. App'x at 778 n.2. There is neither a requirement nor a right to teach continuing medical education courses for credit. The power to give CME credits is not a pre-existing right on which compelled speech is conditioned. Rather, it is a power delegated and voluntarily assumed. "Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist." Downs, 228 F.3d at 1013.

Plaintiffs are free to teach courses on any topic they choose. In their courses they may explain why they do not think "that implicit bias is the primary factor driving disparities in healthcare[.]" See

8

Compl. at ¶33. But if they want California to award state-created credits to participants in their courses, they must teach courses that address the content the legislature has decided is essential for medical practitioners to study. And they must communicate the information that the legislature requires medical practitioners to have. When they do so, they do not speak for themselves, but for the state.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiffs are granted leave to amend the Complaint in conformity with this Order if they can do so consistent with Rule 11 of the Federal Rules of Civil Procedure. An amended complaint must be filed and served no later than January 29, 2024. Failure to file by that date will waive the right to do so. Plaintiffs must provide a redlined version of the amended complaint to the Court's generic chambers email. The Court does not grant leave to add new defendants or new claims. Leave to add new defendants or new claims must be sought by a separate, properly noticed motion.

IT IS SO ORDERED.

Date: December 11, 2023

Dale S. Fischer
United States District Judge