JOSHUA P. THOMPSON, SBN 250955
JThompson@pacificlegal.org
CALEB R. TROTTER, SBN 305195
CTrotter@pacificlegal.org
DONNA G. MATIAS, SBN 154268
DMatias@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
(916) 419-7111

CAMERON T. NORRIS, Va. Bar No. 91624*
cam@consovoymccarthy.com
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
**Pro hac vice*

*Attorneys for Plaintiffs Azadeh Khatibi, M.D., Marilyn M. Singleton, M.D., and Do No Harm*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

AZADEH KHATIBI, M.D., *et al.*,

Plaintiffs,

v.

RANDY W. HAWKINS, in his official capacity as President of the Medical Board of California, *et al.*,

Defendants.

Case No.: 2:23-cv-06195-DSF-E

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Date: March 11, 2024
Time: 1:30 p.m.
Courtroom: 7D
Judge: Honorable Dale S. Fischer
Trial Date: February 25, 2025
Action Filed: August 1, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATUTORY AND REGULATORY BACKGROUND .......... 2

STANDARD OF REVIEW .......... 3

ARGUMENT .......... 4

I. Plaintiffs Sufficiently Allege a Compelled Speech Claim .......... 4

II. The Content of CME Courses Is Private Speech .......... 7

A. There is no history of CME courses as government speech .......... 8

B. The public perceives the content of CMEs as coming from private instructors .......... 10

C. The government does not control the content of CMEs .......... 12

D. This compelled speech case is fundamentally different from government speech and school curriculum cases .......... 15

III. Plaintiffs Sufficiently Allege an Unconstitutional Condition .......... 19

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020) .......... 3, 5

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1988) .......... 3

*Brown v. Li*, 308 F.3d 939 (9th Cir. 2002) .......... 16

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) .......... 2, 18

*Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000) .......... 2, 16, 17, 18

*Green v. Miss United States of America, LLC*, 52 F.4th 773 (9th Cir. 2022) .......... 4

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) .......... 1, 16

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) .......... 5

*Kotler v. Webb*, No. 19-2682-GW-SKx, 2019 WL 4635168 (C.D. Cal. Aug. 29, 2019) .......... 9, 12, 14

*Lathus v. City of Huntington Beach*, 56 F.4th 1238 (9th Cir. 2023) .......... 5

*LSO, Ltd. v. Stroh*, 205 F.3d 1146 (9th Cir. 2000) .......... 4

*Matal v. Tam*, 582 U.S. 218 (2017) .......... 7, 8, 9, 12, 14, 15

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) .......... 5

*Nampa Classical Academy v. Goesling*, 447 F. App'x 776 (9th Cir. 2011) .......... 1, 15, 16

*National Institute of Family and Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361 (2018) .......... 1, 4, 5, 7, 17

*Ogilvie v. Gordon*, No. 20-cv-01707-JST, 2020 WL 10963944 (N.D. Cal. July 8, 2020) .......... 9, 12, 14

*Perry v. Sindermann*, 408 U.S. 593 (1972) .......... 19

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) .......... 2, 18

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) .......... 1, 8, 9, 13, 14

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988) .......... 5

*Sangervasi v. City of San Jose*, No. 22-CV-07761-VKD, 2023 WL 3604308 (N.D. Cal. May 22, 2023), *appeal docketed*, No. 23-15923 (9th Cir. June 23, 2023) .......... 18

*Shurtleff v. City of Boston, Mass.*, 596 U.S. 243 (2022) .......... 8, 10, 14, 15, 18

*W.V. St. Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) .......... 1, 4, 5

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) .......... 1, 8, 9, 13, 14, 17

*Wooley v. Maynard*, 430 U.S. 705 (1977) .......... 5

*Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626 (1985) .......... 17

**Statutes**

Cal. Bus. & Prof. Code § 2190 .......... 9, 12, 13, 20

Cal. Bus. & Prof. Code § 2190.1(a) .......... 2, 10, 13

Cal. Bus. & Prof. Code § 2190.1(d) .......... 1, 3, 5, 6, 7, 11, 13, 14, 17

Cal. Bus. & Prof. Code § 2190.1(d)(3) .......... 3, 15

Cal. Bus. & Prof. Code § 2190.1(e) .......... 3, 15

Cal. Bus. & Prof. Code § 2190.1(g) .......... 3

Cal. Bus. & Prof. Code § 2191 .......... 10

Cal. Bus. & Prof. Code § 2196 .......... 12

Cal. Bus. & Prof. Code § 6070.5 .......... 19
Cal. Code Regs. tit. 16, § 1336(a) .......... 2, 10
Cal. Code Regs. tit. 16, § 1337(a) .......... 3, 12, 20
Cal. Code Regs. tit. 16, § 1337(b) .......... 3
Cal. Code Regs. tit. 16, § 1337(c)–(f) .......... 2
Cal. Code Regs. tit. 16, § 1337.5 .......... 20

## INTRODUCTION

Defendant President and officers of the Medical Board of California (collectively "Board") do not contest the controversiality of implicit bias trainings or that Cal. Bus. & Prof. Code § 2190.1(d) compels Plaintiffs Dr. Azadeh Khatibi and Dr. Marilyn M. Singleton, as well as at least one member of Plaintiff Do No Harm, to include discussion of implicit bias in the continuing medical education (CME) courses they teach. Rather, the Board argues that Plaintiffs may be compelled to teach these ideas because the "content of continuing medical education courses constitutes government speech." ECF No. 29-1 at 10–11. The Board's novel theory has no support in case law.

When plaintiffs raise compelled speech claims, the Supreme Court analyzes whether the compulsion "alters the content" of the plaintiff's speech. *National Institute of Family and Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2371 (2018) (cleaned up). If so, then the compulsion must satisfy strict scrutiny when it mandates particular content. *Id*. This is true even where the government compels a plaintiff to post a government-created and government-controlled notice. *Id*.

The Board seeks to avoid that longstanding result, *see W.V. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943), by urging this Court to analyze section 2190.1(d) under inapposite government speech precedents. But that requires the Court to ignore the distinct context in which government speech cases arise: attempts by individuals to force government to express or endorse particular messages. *See*, *e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 206 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464 (2009). The same context also arises in school curriculum cases. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 262 (1988); *Nampa Classical Academy*

*v. Goesling*, 447 F. App'x 776, 777 (9th Cir. 2011); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1005 (9th Cir. 2000).[1] That is not what is happening here. Plaintiffs are not trying to get the government to endorse *their* message; they are trying to prevent the government from compelling them to speak *its* message.

Classifying the private content of countless CME courses, created by who knows how many physicians, on the wide range of topics from, for example, "Intraspinal Bone Fragments Resorption in Thoracolumbar Burst Fracture" to "Man With Disappearing Subconjunctival Foreign Body"[2] as *government* speech would also stretch the courts' understanding of that category of speech beyond recognition. Private physicians speaking in their private capacity about topics on which they are experts, is not government speech. The motion to dismiss should be denied.

## STATUTORY AND REGULATORY BACKGROUND

California's CME requirement for licensed physicians allows for a broad range of educational options. The 50-hour biennial requirement, Cal. Code Regs. tit. 16, § 1336(a), can be met by numerous educational activities that "include, but are not limited to," a wide array of topics concerning medical practice, Cal. Bus. & Prof. Code § 2190.1(a); Cal. Code

---

[1] Even if it is true that "CME instructors speak for the state while teaching courses," ECF No. 25 at 8, such speech would be analyzed under *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), not the government speech precedents cited by the Board. *See Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (explaining that First Amendment challenges brought by those engaging in public "speech related to scholarship or teaching" are subject to the *Pickering* test).

[2] These are just two of the 3,343 CME courses available for credit on the website of the American Medical Association. *See* https://edhub.ama-assn.org/by-topic.

Regs. tit. 16, § 1337(c)–(f). So long as a CME course is a proper educational activity and is accredited by the California Medical Association, American Medical Association, American Academy of Family Physicians, Accreditation Council for Continuing Medical Education, or "other organizations and institutions acceptable to" the Medical Board of California, then it counts toward the 50-hour requirement. *See* § 2190.1(g); Cal. Code Regs. tit. 16, § 1337(a)–(b). In addition to that nonexclusive array of possible topics, the legislature mandates a few specific inclusions, such as the implicit bias requirement challenged here. *See* Cal. Bus. & Prof. Code § 2190.1(d).

As to the implicit bias requirement, section 2190.1(d) requires that *all* courses must include "[e]xamples of how implicit bias affects perceptions and treatment decisions of physicians and surgeons, leading to disparities in health outcomes," or "[s]trategies to address how unintended biases in decisionmaking may contribute to health care disparities by shaping behavior and producing differences in medical treatment along lines of" various individual characteristics, or a combination of both. § 2190.1(e). The law otherwise delegates to the private accrediting organizations the task of establishing standards for approving the content of the implicit bias requirement. § 2190.1(d)(3).

## STANDARD OF REVIEW

When considering a motion to dismiss, courts "must review the complaint in the light most favorable to Plaintiffs, accept their factual allegations as true," and grant dismissal only if "Plaintiffs undoubtedly can prove no set of facts in support of their claims that would entitle them to relief." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Plaintiffs only need to plead general factual allegations, as the Court "presume[s] that general allegations embrace those specific facts

that are necessary to support the claim." *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1156 (9th Cir. 2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (cleaned up).

## ARGUMENT

### I. Plaintiffs Sufficiently Allege a Compelled Speech Claim

The Board contests whether Plaintiffs have sufficiently stated a compelled speech claim due to supposedly failing to allege that complying with the implicit bias requirement would cause Plaintiffs to utter speech that is "readily associated" with them. ECF No. 29-1 at 18. The Board's argument fails for three reasons.

***First***, the Board gets the standard wrong. It argues that the standard for determining whether speech is compelled is whether the message is "readily associated" with an objecting plaintiff. ECF No. 29-1 at 18. It is not. Instead, courts evaluate whether the government compulsion "alters the content" of a plaintiff's speech to determine whether a plaintiff has stated a compelled speech claim. *See NIFLA*, 138 S. Ct. at 2371; *Green v. Miss United States of America, LLC*, 52 F.4th 773, 791 (9th Cir. 2022).[3]

At least as early as *Barnette*, the Court recognized the importance of altered content in speech compulsion cases. 319 U.S. 624. There, the Court declared compulsory flag saluting and reciting of the pledge of allegiance in schools violated the First Amendment because the requirements forced students "to utter what is not in [their] mind[s]." *Id.* at 626–29, 634, 642. More recently, in *NIFLA*, a notice requirement was

---

[3] In *Green*, the Ninth Circuit: (1) declined to analyze the case under the First Amendment's freedom of association clause, instead reviewing the case as only a compelled speech case, 52 F.4th at 777; and (2) repeatedly relied on the conclusion that the content of speech was altered in holding that speech was improperly compelled, *id.* at 785–86, 791, 802–03.

a content-based regulation of speech because it "compel[led] individuals to speak a particular message," thus "altering the content of their speech." 138 S. Ct. at 2371 (citing authorities) (cleaned up). In between *Barnette* and *NIFLA*, the Court's analysis has remained consistent. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 581 (1995) ("Disapproval of a private speaker's statement does not legitimize use of [state] power to compel the speaker to alter the message…"); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988) (speech compelled because it "necessarily alter[ed] the content of the speech"); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256–58 (1974) (law intruded on the right of editors to choose the content to be published); *Wooley v. Maynard*, 430 U.S. 705, 715–17 (1977) (forced individuals to use their private property as a "mobile billboard" for the state).

*Lathus v. City of Huntington Beach*, 56 F.4th 1238 (9th Cir. 2023), is distinguishable in two ways. First, it is best understood as a misattribution case, not a compelled speech case like this one. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020) ("the constitutional issue in [speech misattribution] cases arose because the State forced one speaker to host another speaker's speech."). Second, to the extent that *Lathus* applies in the compelled speech context, it does not replace the "altered content" standard because it is limited to its facts where "an elected official can compel the public speech of her representative because that speech will be perceived as the elected official's own." 56 F.4th at 1243.

Here, Plaintiffs' First Amended Complaint correctly alleges that section 2190.1(d) will alter the content of their speech. For example, Dr. Khatibi alleges that because her "courses do not generally cover

disparities in care, and because there is limited time available for instruction in a given course, section 2190.1(d) … prevents her from having a more robust and appropriate discussion of the topic." ECF No. 26, ¶ 43. Dr. Singleton alleges that compliance with section 2190.1(d) would force her "to include information that is not relevant to her chosen topic," and "would require her to change a portion of the talk to include information on implicit bias at the expense of other information she would prefer to include." ECF No. 26, ¶ 55. And Do No Harm alleges that at least one of its members "would not include discussion of implicit bias in the continuing medical education courses taught by her" if not for section 2190.1(d). ECF No. 26, ¶ 62. *See also* ECF No. 26, ¶¶ 66–67.

***Second***, even if the Board is correct that Plaintiffs must allege that discussion of implicit bias is "readily associated" with Plaintiffs instead of the government, Plaintiffs have so alleged. As noted below, *infra* at 11, Dr. Khatibi makes multiple allegations that attendees of CME courses taught by her "treat her as the person responsible for the content discussed." ECF No. 26, ¶¶ 37–40, 44. Likewise, as noted below, *infra* at 11, Dr. Singleton also alleges that attendees of CME courses attribute the content of her CME courses to her. ECF No. 26, ¶¶ 51–52, 56.

***Third***, the Board's factual statement—that medical professionals taking CME courses "understand that it is the Legislature and the Medical Board that set the standards for these courses and determine which courses are eligible for credit," ECF No. 29-1 at 18—is improper on a motion to dismiss. In any event, it does not support the Board's implication that the *content* of CME courses is "readily associated" with the Legislature and the Board rather than instructors. Nor does the Board's assertion that Plaintiffs could simply disavow their agreement with the implicit bias requirement and inform attendees of their courses

that its inclusion is mandated by the legislature, *see id.*, somehow immunize section 2190.1(d) from First Amendment scrutiny. Nothing in the mandated notices at issue in *NIFLA* prevented objecting clinics from making clear to patients their disagreement with the notices, but the Court still applied strict scrutiny to the compelled speech. 138 S. Ct. at 2369–70; *id.* at 2371 ("By requiring petitioners to inform women how they can obtain state-subsidized abortions—*at the same time petitioners try to dissuade women from choosing that option*—the licensed notice plainly 'alters the content' of petitioners' speech.") (emphasis added). Plaintiffs have stated a compelled speech claim.

## II. The Content of CME Courses Is Private Speech

Much like continuing legal education courses may be given by any lawyer in his or her private capacity,[4] CME courses are given by private doctors in their private capacity. This private speech is not transformed into government speech simply because the speaker must address certain topics. Courts "must exercise great caution before extending our government-speech precedents," because the failure to do so renders the doctrine "susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). That is precisely the worry here. The Board argues that the "content of continuing medical education courses constitutes government speech." ECF No. 29-1 at 10–11. Were this Court to adopt the Board's

[4] Some of Plaintiffs' counsel work for Pacific Legal Foundation (PLF)—a nonprofit legal organization that defends Americans' liberties when threatened by government overreach and abuse. PLF is an accredited MCLE provider by the State Bar of California. Surely, the State Bar of California does not think PLF attorneys are speaking on its behalf when giving CLEs.

argument, it "would constitute a huge and dangerous extension of the government-speech doctrine."[5] *Tam*, 582 U.S. at 239.

The Supreme Court "conduct[s] a holistic inquiry" to determine whether expression is government speech. *Shurtleff v. City of Boston, Mass.*, 596 U.S. 243, 252 (2022). In conducting that inquiry, the Court considers three main factors: (1) "the history of the expression at issue;" (2) "the public's likely perception as to who (the government or a private person) is speaking;" and (3) "the extent to which the government has actively shaped or controlled the expression." *Id*. (citing *Walker*, 576 U.S. at 209–14). All three weigh in favor of CME course content being protected speech.

**A. There is no history of CME courses as government speech**

In considering whether the first factor is met, this Court must examine whether CME has historically been an avenue for the government to speak. For example, in *Summum*, the Court held that permanent monuments displayed on public property are an expression of government speech, in part, because "[g]overnments have long used monuments to speak to the public." 555 U.S. at 470. Similarly, in *Walker*—a case "which likely marks the outer bounds of the government-speech doctrine," *Tam*, 582 U.S. at 238—approved messages on specialty license plates were deemed government speech, in part, because "the history of license plates shows that … they have long communicated messages from the States." 576 U.S. at 210–11. In short, the factor weighed in favor of a finding of government speech in those cases because

[5] As there are more than 50 licensed professions in California with continuing education requirements, the implications of the Board's government speech argument are drastic.

the government has historically spoken through public monuments and specialty license plate designs.

On the other hand, in *Tam*, federal registration of trademarks did not convert the marks to government speech. 582 U.S. at 239. There, the Court recognized that trademarks—marks that the government "does not dream up" or edit—"have not traditionally been used to convey" government messages. *Id*. at 235, 238. Likewise, in *Kotler v. Webb*, No. 19-2682-GW-SKx, 2019 WL 4635168, at *6–7 (C.D. Cal. Aug. 29, 2019), this Court held that—unlike the specialty license plates in *Walker*—it was "unaware of any history of states using" custom vanity license plates to speak to the public. *See also Ogilvie v. Gordon*, No. 20-cv-01707-JST, 2020 WL 10963944, at *3 (N.D. Cal. July 8, 2020) (same).

Here, the Board notes that the "Legislature has a longstanding history of using continuing education curriculum requirements as a way to ensure that licensed physicians are adequately trained in subjects the State considers essential to maintaining competence." ECF No. 29-1 at 11. *See also* Cal. Bus. & Prof. Code § 2190. But all that uncontroversial statement establishes is that the state seeks to ensure that doctors maintain knowledge sufficient for ongoing competence. It does not show that the state has historically used CMEs to communicate a governmental message, much less communicate a message to the general public. *See Summum*, 555 U.S. at 470; ECF No. 25 at 6.

Whether and to what extent "governments have exercised power over educational licensing requirements" for physicians generally, ECF No. 25 at 6, that does not address whether continuing education has historically been used by government to speak. In fact, here, the Medical Board is only permitted to "adopt and administer standards" for CME to ensure physician competence. Cal. Bus. & Prof. Code § 2190. In contrast,

sections 2196, 2196.1, 2196.2, 2196.5, 2196.6, and 2196.8 do not concern CME at all and go well beyond establishing mere standards. Instead, separate from the Board's role in regulating CME, they all require the Board to "periodically develop and disseminate information and educational material regarding [] to each licensed physician and surgeon and to each general acute care hospital in the[/this] state."

Rather than "communicate to physicians," the two CME examples the Board relies on, ECF. No. 29-1 at 11–12 (citing Cal. Bus. & Prof. Code §§ 2190.1(c)(1)(A)–(D) and 2190.5(a)),[6] simply establish some of the required CME topics that the legislature has determined to be necessary to maintain physician competence. *See also* § 2191 (setting out numerous courses and topics that the Board "shall consider" requiring). Nowhere does the Board assert that the implicit bias requirement is employed to communicate with physicians. *See Shurtleff*, 596 U.S. at 255 ("we must examine the details of *this* [] program.") (original emphasis).

**B. The public perceives the content of CMEs as coming from private instructors**

Regardless of whether the regulated nature of the medical profession and the requirements for continuing education lead to a logical conclusion that CME attendees know CME courses are approved for required credit by the government, ECF No. 29-1 at 12–13, such conclusion does not address who course attendees attribute the content of CME courses to, ECF No. 25 at 12.

Physicians are required to take 50 hours of CME biennially. Cal. Code Regs. tit. 16, § 1336(a). Cal. Bus. & Prof. Code § 2190.1(a) identifies a wide array of nonexclusive topics that will be approved for credit so long as an individual course is first approved by certain *private* organizations.

[6] Neither of those discrete CME requirements are challenged in this case.

In addition, a few specific topics, like section 2190.1(d)'s implicit bias requirement, are also mandated. Thus, at most, course attendees may view these required topics as "governmental" mandates. But just because there is a government-mandated topic does not mean the public recognizes the content of those courses—which are approved and provided by private groups and physicians—as government *speech*.

Indeed, Dr. Khatibi alleges that "during and after CME courses taught by [her], attendees treat her as the person responsible for the content discussed," ECF No. 26, ¶ 40, because attendees engage in conversation and debate with Dr. Khatibi about the content taught by her and even complete evaluations about her effectiveness and whether her presentation exhibited any bias, *id*. at ¶¶ 37–39. Dr. Khatibi also alleges that "attendees are likely to attribute the content of CME courses taught by [her] as coming from her [and] not the Medical Board," because section 2190.1(d) requires her to articulate her own "examples" of, or "strategies" to prevent, implicit bias. ECF No. 26, ¶ 44. Likewise, Dr. Singleton alleges that attendees of CME courses taught by her commonly approach her "to ask questions and engage in conversation about the course and material discussed," and complete evaluations on her effectiveness. ECF No. 26, ¶¶ 51–52. Dr. Singleton also alleges that "informing an audience of her disagreement with including mandatory discussion of implicit bias would be insufficient to make clear that the government's required message is not her own" because of the requirements of section 2190.1(d) to supply her own "examples" of, or "strategies" to prevent, implicit bias.[7] ECF No. 26, ¶ 56.

---

[7] The Board's suggestion that Plaintiffs are free to disclaim their required discussion of implicit bias, ECF No. 29-1 at 13, lends support to CME content being attributed to instructors and not the government. After all,

In *Tam*, there was "no evidence that the public associates the contents of trademarks with the" government. 582 U.S. at 238. The government even disavowed that registration constituted approval of a mark, and the Court noted it was "unlikely that more than a tiny fraction of the public has any idea what federal registration of a trademark means." *Id*. at 237. And this Court in *Kotler* recognized that, "it strain[ed] believability to argue that viewers perceive the government as speaking through personalized vanity plates." 2019 WL 4635168, at *7. *See also Ogilvie*, 2020 WL 10963944, at *3–4.

If "[t]he public understands the difference" between specialty plate designs and custom vanity license plates, *Kotler*, 2019 WL 4635168, at *7, then so too does the public understand the difference between the government requiring private organizations to develop CME courses covering certain topics to be taught by private instructors and, for example, the Medical Board itself creating and communicating information on detecting child abuse directly to every doctor and hospital in California, Cal. Bus. & Prof. Code § 2196.

### C. The government does not control the content of CMEs

California exercises almost no control over the content of CMEs. While the Medical Board is responsible for "adopt[ing] and administer[ing] standards" for CME, Cal. Bus. & Prof. Code § 2190, it has outsourced the implementation of standards to private organizations and instructors, *see* Cal. Code Regs. tit. 16, § 1337(a). The 3,343 courses available on the AMA's website, for example, represent just a fraction of

---

if CME attendees already perceived the content as coming from the state, no instructor disclaimers would be necessary. In any event, the Board's attempt to parse out the bulk of CME content as government speech while impliedly excluding instructor disclaimers finds no support in case law and would be unworkable.

the courses that are eligible for CME credit. *See also* Cal. Bus. & Prof. Code § 2190.1(a) (educational activities that satisfy CME standards "may include, but are not limited to…"). It is inconceivable that the government exercises control over the content of thousands of courses it does not create, supervise, or otherwise participate in, or even audit. Indeed, all CME courses are presumptively awarded CME credit. ECF. No. 26, ¶ 21 (citing Cal. Code Regs. tit. 16, § 1337.5(b)).

Nor is the content of CME courses taught by Plaintiffs controlled by the government.[8] All courses taught and organized by Drs. Khatibi and Singleton were approved by authorized CME providers—not the government—and other than topics required by section 2190.1, the content of each of their courses "was created and compiled by [them] without any supervision, approval, control, or input by any government official." ECF. No. 26, ¶¶ 34–35, 48–49. The Medical Board has not even audited any of their courses. *Id*. at ¶ 36, 50; ECF No. 29-1 at 16:8–10.

The lack of control over the content of CME courses stands in stark contrast to *Summum*, where the Court noted the history of municipalities using various methods to "exercise editorial control" over the monuments they chose to erect. 555 U.S. at 472. Editorial control is necessary because monuments displayed on public property are "meant to convey and have the effect of conveying a government message." *Id*. Likewise, in *Walker*, Texas law granted the government "sole control" over license plates, thus the government had to "approve every specialty plate design proposal before the design can appear on a Texas plate." 576 U.S. at 213. Unlike

[8] The Board avers that a lack of control would "contradict" Plaintiffs' compelled speech claim. ECF. No. 29-1 at 14. But even though the Board does not control the content needed to satisfy section 2190.1(d)'s mandated topic, Plaintiffs are still compelled to discuss the topic when they otherwise would not. ECF No. 26, ¶ 42, 55, 61, 66-67.

*Summum* and *Walker*, the Board does not "exercise editorial control" over, or approve, every CME course.

Even though the governmental control was much greater in both *Shurtleff* and *Tam* than it is here, the Court in those cases held it was insufficient to invoke the government speech doctrine. In *Shurtleff*, the City of Boston permitted private groups to request to display flags of their choosing on one flagpole outside of city hall. 596 U.S. at 248. The Court held that the display of private groups' flags on a city flagpole was not government speech because the city exerted no control over the messages conveyed by the flags. *Id.* at 256–57. Similarly, in *Tam*, so long as trademarks sought for registration met viewpoint-neutral requirements, registration of the mark by the Patent and Trademark Office was mandatory. 582 U.S. at 235. And in *Kotler*, while the government had to approve every proposed customized vanity license plate, it was "nonsensical" to conclude that government approval of hundreds of thousands of custom plates in California equated to the "direct control" contemplated under the Supreme Court's government speech precedents. 2019 WL 4635168, at *7. *See also Ogilvie*, 2020 WL 10963944, at *4 ("The fact that the government exerts regulatory control over speech cannot, on its own, transform that speech into government speech".).

As discussed above, here, the limited control the government exerts over the content discussed in CME courses does not suffice to transform the content into government speech. Nor does the government exert sufficient control over the implicit bias requirement to convert content meant to satisfy that requirement into government speech. Section 2190.1(d) states that all courses must include "[e]xamples of how implicit bias affects perceptions and treatment decisions of physicians and surgeons, leading to disparities in health outcomes," or "[s]trategies to

address how unintended biases in decisionmaking may contribute to health care disparities by shaping behavior and producing differences in medical treatment along lines of" various individual characteristics, or a combination of both. § 2190.1(e). Within those broad parameters, the content is left entirely to the discretion of instructors and private accrediting organizations. *See* § 2190.1(d)(3); ECF No. 26, ¶¶ 44, 56.

**D. This compelled speech case is fundamentally different from government speech and school curriculum cases**

As seen in the cases discussed above, the government speech doctrine arises where the government is concerned about speech that might be attributed *to it*. From the denial of a religious group's proposed monument, to the rejection of a license plate, flag, or trademark, the Court's government speech cases arise where the government rejects speech that might be associated with the government itself. The Board ignores that key context—which is absent here—as well as the Court's warning against extending the government speech doctrine beyond specialty license plates. *See Tam*, 582 U.S. at 235, 239. *See also Shurtleff*, 596 U.S. at 252 (government speech analysis "driven by a case's context rather than the rote application of rigid factors."). Instead, attempting to affect a major expansion of government speech, the Board analogizes to public school curriculum cases to claim that continuing education courses are government speech. This Court should reject the analogy.[9]

[9] Whether CME is "more like public school curricula than monuments, license plates, trademarks, and flags," ECF No. 25 at 8, is immaterial. School curriculum is at most a subset of government speech fact-bound to the public school context. *See Nampa Classical Academy*, 447 F. App'x at 778 ("this court has never explicitly held that a public school's curriculum is a form of governmental speech").

All cases relied upon by the Board involve circumstances far afield from this case, where public entities or public officials are speaking. *Nampa Classical Academy*, 447 F. App'x at 778, explains the school curricula line of cases succinctly. There, the court held that because charter schools "are governmental entities, the curriculum presented in such a school is not the speech of teachers … but that of the [state] government." The court so held "because the message is communicated by employees working at institutions that are state-funded, state-authorized, and extensively state-regulated." *Id.* The remaining cases cited by the Board follow a similar path. *See Hazelwood Sch. Dist.*, 484 U.S. at 271 (public school officials free to "exercise great[] control over" expressive activities of students that "may fairly be characterized as part of the school curriculum"); *Downs*, 228 F.3d at 1005 (public high schools may decline to allow views that are "antagonistic and contrary" to the school's own to be expressed on school property to students by one of the school's teachers). *See also Brown v. Li*, 308 F.3d 939, 947 (9th Cir. 2002) (public university may restrict student speech so long as the "limitation is reasonably related to a legitimate pedagogical purpose"). None of the characteristics of the school curriculum cases are present here, where private individuals voluntarily teach CME courses to private licensed physicians, under the auspices of private organizations responsible for accrediting the courses, and largely unsupervised by the government except for the broad standards and few mandated inclusions.

Another reason that government speech and school curriculum cases are inapplicable here is that the implicit bias requirement, if not purely compelled speech, is more akin to a disclosure or notice requirement. But even if the implicit bias requirement was like a disclosure requirement, it would still not implicate the government

speech doctrine. For example, in *NIFLA*, 138 S. Ct. at 2369–70, a California law mandated crisis pregnancy centers post a "government-drafted notice on site." Because the notice requirement compelled clinics' speech, the Court analyzed the requirement as compelled—not government—speech. *Id.* at 2371. Even under *Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 650–51 (1985), mandated disclosures of "purely factual and uncontroversial information" in commercial advertising implicate an advertiser's First Amendment rights. If section 2190.1(d) only sought to compel CME instructors to recite a governmental message verbatim—it does much more than that of course—it would still be unconstitutional compelled speech under *NIFLA*. In other words, if a scripted notice requirement from the government is not "government speech," then a broad requirement that CME instructors teach a certain topic cannot be either.

The Board notes the Court's admonishment in *Walker* that government speech can still be government speech even if "private parties take part in the design and propagation of a message." ECF No. 29-1 at 17 (quoting 576 U.S. at 217). But the Court's admonishment was made in the context of individuals submitting proposed designs for specialty license plates to the government, and once a design was accepted for use on a plate, it transformed into government speech under the Court's analysis. *See* 576 U.S. at 217. The same was true of monuments accepted for display in *Summum*. *Id.* The same is not true here, where, as discussed above, speech made to comply with the implicit bias requirement is not associated with or controlled by the government.[10]

---

[10] That distinction also makes inapplicable here the Ninth Circuit's statement in *Downs* that "because the government opens its mouth to

*Sangervasi v. City of San Jose*, No. 22-CV-07761-VKD, 2023 WL 3604308 (N.D. Cal. May 22, 2023), *appeal docketed*, No. 23-15923 (9th Cir. June 23, 2023), is not to the contrary. There, the San Jose Police Department gave police officers the option of replacing their typical uniform shoulder patch with one of three specialty patches. *Id*. at *2, *5. One officer took issue with the options and proposed his own, which were rejected. *Id*. at *2. Applying *Shurtleff*, the court held that the authorized patches were government speech because the patches were to be placed on official police uniforms and the police department "completely controlled the uniform patch designs." *Id*. at *5. Thus, while "government may enlist private persons to convey its governmental message," that is not what occurred in *Sangervasi* where the government speech was voluntary and where a public employee sought to have the official police uniform deemed a public forum open for private expression. *Id*. at *4.

Even if this was a case concerning the compulsion of speech made by one speaking for the government, government speech case law would still not apply. Instead, the Court's test in *Pickering*, 391 U.S. 563, is the appropriate framework for considering First Amendment challenges brought by those engaging in public "speech related to scholarship or teaching." *See Demers*, 746 F.3d at 412.

Plaintiffs seek to not be compelled to engage in controversial speech regarding implicit bias. Were this a case of physicians complaining about being required to take a course on implicit bias, or of instructors being prevented from teaching certain CME topics or material, the school

---

speak does not give every outside individual or group a First Amendment right to play ventriloquist." 228 F.3d at 1013. Plaintiffs do not seek to change any speech offered by the Board; rather, they seek not to be compelled to engage in speech that is not associated with or controlled by the Board.

curriculum cases would at least superficially apply, as those cases would be attempts to change required curriculum.[11] But that is not this case. Instead, this case involves private actors given broad parameters on including discussion of implicit bias in CME courses taught by them. All specifics on fulfilling those broad parameters are up to individual instructors like Plaintiffs and private organizations responsible for accrediting the courses. The government's speech is thus not at issue.

## III. Plaintiffs Sufficiently Allege an Unconstitutional Condition

Plaintiffs allege a "right to teach [CME] courses for credit free from the condition" to comply with the implicit bias requirement. ECF No. 26, ¶ 78. "Even though a person has no 'right' to a valuable governmental benefit" like teaching CME courses for credit, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). For example, the Court has applied the unconstitutional conditions doctrine to denials of tax exemptions, unemployment benefits, welfare payments, and denials of public employment. *Id.* (collecting cases). So long as a plaintiff alleges the denial of a benefit is based on the plaintiff's exercise of protected speech, she or he has sufficiently alleged a claim under the unconstitutional conditions doctrine. *Id.* at 598.

Here, Plaintiffs allege that their ability to teach CME courses for credit is conditioned on their including discussion of implicit bias in their

[11] This is how the State Bar of California mandates implicit bias training. Cal. Bus. & Prof. Code § 6070.5. Whether that mandate is constitutional is a different question not necessarily implicated by this case. To be clear, Plaintiffs do not argue here that the school curriculum cases would apply in such a case, only that the applicability of those cases could be plausibly argued. That plausibility is absent here. The school curriculum cases have no applicability whatsoever.

courses. ECF No. 26, ¶ 79. Because, as discussed above, being compelled to include discussion of implicit bias violates Plaintiffs' right to free speech, they have sufficiently alleged an unconstitutional condition.

The Board urges dismissal of Plaintiffs' unconstitutional condition claim on the grounds that "giv[ing] CME credits is not a pre-existing right on which compelled speech is conditioned." ECF No. 29-1 at 19 (quoting ECF No. 25 at 8). But Plaintiffs do not allege a right to give CME credit. *See* ECF No. 26, ¶¶ 78–83. In fact, California law does not give CME instructors, including Plaintiffs, the "power to give CME credits." *See* ECF No. 25 at 8. That power is retained by the state and delegated to the Board. *See* Cal. Bus. & Prof. Code § 2190; Cal. Code Regs. tit. 16, §§ 1337(a), 1337.5. Instead, CME instructors teach courses that, if all statutory and Board standards and requirements are satisfied (including the implicit bias requirement), the Board awards CME credit to physicians for completing.

## CONCLUSION

For all the reasons discussed above, this Court should deny the Board's Motion to Dismiss.

DATED: February 20, 2024.

Respectfully submitted,

JOSHUA P. THOMPSON, SBN 250955
CALEB R. TROTTER, SBN 305195
DONNA G. MATIAS, SBN 154268
CAMERON T. NORRIS, Va. Bar No. 91624*

By */s/ Caleb R. Trotter*
CALEB R. TROTTER

**Pro hac vice*
*Attorneys for Plaintiffs*