FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AZADEH KHATIBI, M.D., an individual; DO NO HARM, a Virginia nonprofit corporation,<br><br>              *Plaintiffs - Appellants*,<br><br>  v.<br><br>RANDY HAWKINS, in his official capacity as President of the Medical Board of California; LAURIE ROSE LUBIANO, in her official capacity as Vice President of the Medical Board of California; REJI VARGHESE, in his official capacity as Executive Director of the Medical Board of California; MARINA O'CONNOR, in her official capacity as Chief of Licensing, Medical Board of California; RYAN BROOKS, in his official capacity as Secretary of the Medical Board of California,<br><br>              *Defendants - Appellees*. | No. 24-3108<br><br>D.C. No.<br>2:23-cv-06195-MRA-E<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Monica Ramirez Almadani, District Judge, Presiding

Argued and Submitted March 27, 2025
Pasadena, California

Filed July 25, 2025

Before: A. Wallace Tashima, Jacqueline H. Nguyen, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Nguyen

## SUMMARY[*]

### First Amendment/Government Speech

The panel affirmed the district court's dismissal of an action, brought by a physician instructor of continuing medical education (CME) courses and a nonprofit comprised of healthcare professionals and policymakers, alleging that the Medical Board of California's requirement that CME courses eligible for credit include information about implicit bias violates the Free Speech Clause of the First Amendment.

Applying the factors set forth in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), the panel held that under California's scheme, CME courses eligible for credit by the Medical Board of California are government speech. First, California has a longstanding tradition of regulating the medical profession. Second, the public would tend to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

attribute CME speech to the government rather than to CME instructors.  Finally, California controls the content of CME courses and imposes several restrictions on their form and delivery.

Because CME courses eligible for credit are government speech, they are immune from the strictures of the Free Speech Clause.

## COUNSEL

Joshua P. Thompson (argued) and Caleb R. Trotter, Pacific Legal Foundation, Sacramento, California; Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, Virginia; for Plaintiffs-Appellants.

Kristin Liska (argued) and Stephanie Albrecht, Deputy Attorneys General; Lara Haddad, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Francisco, California; for Defendants-Appellees.

Andrew L. Schlafly, Attorney at Law, Far Hills, New Jersey, for Amicus Curiae Association of American Physicians and Surgeons.

Thomas A. Berry and Alexander R. Khoury, Cato Institute, Washington, D.C., for Amicus Curiae the Cato Institute.

Madison Hahn, Young America's Foundation, Reston, Virginia; Brooks E. Harlow, Technology & Communications Law PLLC, Herndon, Virginia; for Amicus Curiae Young America's Foundation.

Stanley J. Brown, Benjamin A. Fleming, and Shannon Zhang, Hogan Lovells US LLP, New York, New York; David S. Tatel, Amanda N. Allen, and Ashley Ifeadike, Hogan Lovells US LLP, Washington, D.C.; Dariely Rodriguez, Adria Bonillas, and Kathryn Youker, Lawyers' Committee for Civil Rights Under the Law, Washington, D.C.; for Amici Curiae the NAACP California Hawaii State Conference, the Lawyers' Committee for Civil Rights Under Law, and the Lawyers' Committee for Civil Rights of the San Francisco Bay Area.

---

# OPINION

NGUYEN, Circuit Judge:

California's regulation of the medical profession dates back to the late 1800s when, following the Gold Rush, it suffered an epidemic of "cults and fads and a great deal of quackery." *See* Linda A. McCready & Billie Harris, FROM QUACKERY TO QUALITY ASSURANCE: THE FIRST TWELVE DECADES OF THE MEDICAL BOARD OF CALIFORNIA 2–4 (MED. BD. CA. 1995). In response to this crisis, the State adopted the Medical Practice Act of 1876. *Id.* at 3. The Act created the Board of Medical Examiners, which sought to impose basic regulations on the practice of medicine. *Id.*

Today, the Medical Board of California, as the Board of Medical Examiners is now known, aims to ensure "the continuing competence of licensed physicians and surgeons." CAL. BUS. & PROF. CODE § 2190.[1] It "adopt[s]

---

[1] All undesignated statutory references are to this code.

and administer[s] standards for the continuing education of those licensees," obligating them to complete at least 50 hours of accredited continuing medical education ("CME") every two years. *Id.*; Cal. Code Regs. (CCR) tit. 16, § 1336(a). Not just any CME, however, qualifies for credit. Only classes that meet various state requirements are eligible. *See id.* at § 1337(b). For instance, CME courses must at least "increase the knowledge, skills, and professional performance that a physician and surgeon uses to provide care," address "cultural and linguistic competency in the practice of medicine," and include information about "the understanding of implicit bias." *See* §§ 2190.1(a), (b)(1), (d)(1).

This case challenges one of these CME requirements, namely section 2190.1(d)(1)'s mandate to include information about implicit bias. Plaintiffs Dr. Khatibi and Do No Harm (collectively, "Dr. Khatibi" or "Plaintiffs") claim that the implicit bias requirement violates the First Amendment.[2] The district court dismissed their suit. It held that CMEs eligible for credit constitute government speech and are therefore "'not subject to scrutiny under the Free Speech Clause.'" *See Khatibi v. Hawkins*, No. 2:23-cv-06195, 2024 U.S. Dist. LEXIS 81485, *9 (C.D. Cal. May 2, 2024) (*Khatibi II*) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009); *see also Shurtleff v. City of Boston*, 596 U.S. 243, 247–48 (2022) ("[W]hen the

---

[2] Our opinion does not address the allegations of Dr. Marilyn Singleton, who was originally another plaintiff in this case. She passed away after the notice of appeal was filed, and we construe and grant Plaintiffs' notice as a motion to dismiss Dr. Singleton as a party in this appeal under Federal Rule Civil Procedure 25(a)(1)–(2). *See Bordallo v. Reyes*, 763 F.2d 1098, 1101 (9th Cir. 1985) (construing "whether a motion, however styled, is appropriate for the relief requested").

government speaks for itself, the First Amendment does not demand airtime for all views. After all, the government must be able to promote a program . . . in order to function."). Plaintiffs appealed. We affirm.

"[W]hether the government intends to speak for itself" is determined by a "holistic inquiry" that considers "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252. On balance, these factors weigh in favor of California. We therefore hold that under the State's scheme, CMEs eligible for credit by the Medical Board of California are government speech.

Our holding is narrow. It recognizes that when California—from beginning to end—dictates, controls, and approves the provider, form, purpose, and content of CMEs, it is in fact the State that "speaks" or expresses its views. California does so consistent with its tradition, "from time immemorial," of protecting its populace from the "consequences of ignorance and incapacity" in medicine, a profession "upon which health and life depend" and requires the most careful preparation—propositions that have been "too well settled to require discussion." *See Dent v. West Virginia*, 129 U.S. 114, 122 (1889); *Watson v. Maryland*, 218 U.S. 173, 176 (1910).

## I.

California law sets forth various CME requirements "to ensure the continuing competence of licensed physicians and surgeons." § 2190. CMEs must "(1) have a scientific or clinical content with a direct bearing on the quality or cost-effective provision of patient care, community or public

health, or preventive medicine, (2) concern quality
assurance or improvement, risk management, health facility
standards, or the legal aspects of clinical medicine,
(3) concern bioethics or professional ethics, (4) are designed
to improve the physician-patient relationship and quality of
physician-patient communication," or otherwise "serve to
maintain, develop, or increase the knowledge, skills, and
professional performance that a physician and surgeon uses
to provide care, or to improve the quality of care provided to
patients." *Id.* § 2190.1(a) (cleaned up).

The State charges its Medical Board to "adopt and
administer standards for the continuing education of those
licensees." *Id.* § 2190. The Board, in turn, requires that all
licensed physicians complete at least 50 hours of approved
CME every two years. CCR tit. 16, § 1336(a). Only
programs the Board deems "acceptable" are approved for
CME credit. *Id*. §§ 1337(b), 1300.4(e). Courses are
"acceptable" if they meet the express criteria of section
2190.1 and accompanying regulations. *See id.* § 1337.5.
"The content of the course or program shall be directly
related to patient care, community health or public health,
preventive medicine, quality assurance or improvement, risk
management, health facility standards, the legal aspects of
clinical medicine, bioethics, professional ethics, or
improvement of the physician-patient relationship."
*Id.*§ 1337.5(a)(3); *see also id*. § 1337.5(a)(1)–(7) (imposing
requirements on faculty, course rationale and content,
methodology of instruction, evaluation, and attendance).
Certain programs by the California Medical Association,
American Medical Association, and American Academy of
Family Physicians are preapproved for CME credit. *Id*.
§ 1337(a)–(b). The Board does "not give prior approval to
individual courses or programs; however, the division will

randomly audit courses or programs submitted for credit in addition to any course or program for which a complaint is received." *Id*. § 1337.5(b). In addition, no credit is awarded for "any course deemed unacceptable by the division after an audit." *Id*. § 1337.5(c).

In 2019, the Legislature enacted Assembly Bill (A.B.) 241. A.B. 241 amended section 2190.1 to require that "all continuing medical education courses … contain curriculum that includes the understanding of implicit bias." *See* § 2190.1(d)(1). Under A.B. 241, CMEs approved for credit must contain "(1) Examples of how implicit bias affects perceptions and treatment decisions of physicians and surgeons, leading to disparities in health outcomes" or "(2) Strategies to address how unintended biases in decisionmaking may contribute to health care disparities by shaping behavior and producing differences in medical treatment along lines of race, ethnicity, gender identity, sexual orientation, age, socioeconomic status, or other characteristics." *Id*. at § 2190.1(e). CMEs by out-of-state providers or "dedicated solely to research or other issues that does not include a direct patient care component" are exempt from the requirement. *Id*. at § 2190.1(d)(2). A.B. 241 supplements section 2190.1(b)(1)'s separate cultural and linguistic competence requirement, which the Legislature enacted in 2005. *See* 2005 Cal. Stat. ch. 514 § 2; *see also* § 2190.1(c)(1)–(3) (mandating all CMEs to incorporate content such as about the use of proper names and pronouns in therapeutic relationships and application of "culturally, ethnically, and sociologically inclusive data to the process of clinical care").

The Legislature passed A.B. 241 because it had found that implicit bias, "meaning the attitudes or internalized stereotypes that affect our perceptions, actions, and

decisions in an unconscious manner, exists, and often contributes to unequal treatment of people based on race, ethnicity, gender identity, sexual orientation, age, disability, and other characteristics." 2019 Cal. Stat. ch. 417 § 1(a). "Implicit bias," in the Legislature's view, "contributes to health disparities by affecting the behavior of physicians and surgeons, nurses, physician assistants, and other healing arts licensees." *Id.* § 1(b); *see also id.* § 1(c)–(e) (citing "remarkably consistent" evidence of disparities based on race, ethnicity, gender, and sexual orientation, "even after adjusting for" other factors).

Plaintiffs disagree. Dr. Khatibi is a California-licensed physician and Board-certified ophthalmologist. She is a frequent organizer and instructor of CMEs, and her past courses have been approved by state-authorized providers. Her courses have also complied with all state requirements apart from the implicit bias one. Do No Harm is a Virginia-based nonprofit comprised of healthcare professionals and policymakers. It has at least one member who teaches CMEs in California who believes implicit bias trainings "risk infecting healthcare decisions."

Contesting the efficacy of any training on the matter[3] and alleging that the implicit bias requirement violates free

---

[3] Plaintiffs also appear to doubt the existence of implicit bias in medicine generally; they allege that section 2190.1(d)(1) "is unlikely to address the problem of implicit bias in healthcare, *if any*." (emphasis added). Meanwhile, the Board explains that the requirement is essential to the practice of medicine, as deemed by the Legislature, and is "closely related" to that purpose. Some amici echo the Board's points, contending that "[v]irtually every major organization focused on the science of medicine has recognized the existence and impact of implicit bias in the medical sphere" and that its existence is not "subject to

speech rights, Plaintiffs sued the Medical Board of
California. The district court dismissed the operative First
Amended Complaint, holding that "CME courses in
California constitutes government speech." *Khatibi II*, 2024
U.S. Dist. LEXIS 81485, at *23. The district court noted that
Plaintiffs may "choose to no longer instruct CME courses
for credit, as is their right, or err their grievances at the ballot
box because 'it is the democratic electoral process that first
and foremost provides a check on government speech.'" *Id*.
at *25 (quoting *Walker v. Texas Div., Sons of Confederate
Veterans, Inc.*, 576 U.S. 200, 207 (2015)). Plaintiffs timely
appealed.

## II.

"We review de novo a district court order granting a
motion to dismiss for failure to state a claim." *Olson v.
California*, 104 F.4th 66, 76 (9th Cir. 2024) (en banc). "To
survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face." *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (cleaned up). This is "a context-
specific task that requires the reviewing court to draw on its
judicial experience and common sense." *Id*. at 679.

### A.

"The Free Speech Clause restricts government
regulation of private speech; it does not regulate government

---

reasonable dispute." Still, other amici agree with Plaintiffs and find
implicit bias controversial, even divisive.

Like the district court, we express no view on the issue, which is
immaterial to whether CMEs are government speech. *See also Khatibi
v. Hawkins*, No. 2:23-cv-06195, 2023 U.S. Dist. LEXIS 221328, at *4,
n.1 (C.D. Cal. Dec. 11, 2023).

speech." *Summum*, 555 U.S. at 467–68 (collecting cases); *accord Shurtleff*, 596 U.S. at 251. "A government entity has the right to speak for itself . . . and to select the views that it wants to express." *Summum*, 555 U.S. at 467–68 (cleaned up). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Id*. at 468. After all, "[w]hen the government … formulate[s] policies" or "implement[s] programs, it naturally chooses what to say and what not to say." *Shurtleff*, 596 U.S. at 251; *see also Summum*, 555 U.S. at 468 ("'It is the very business of government to favor and disfavor points of view.'" (quoting *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment))).

"A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Summum*, 555 U.S. at 468. "This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause. The involvement of public officials in advocacy may be limited by law, regulation, or practice. And of course, a government entity is ultimately accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Id*. at 468–69 (cleaned up). Additionally, "while the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise

great caution before extending our government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017).

### B.

The "boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program." *Shurtleff*, 596 U.S. at 252; *see also Summum*, 555 U.S. at 470. "In those situations, when does government-public engagement transmit the government's own message? And when does it instead create a forum for the expression of private speakers' views? In answering these questions, we conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression."[4] *Shurtleff*, 596 U.S. at 252. Among the factors to consider in this analysis are "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id*. (collecting cases).

Take, for example, *Johanns v. Livestock Marketing Association*, 544 U.S. 550, 560 (2005), which upheld the

---

[4] The government speech analysis thus sometimes interfaces with the public forum doctrine. *See, e.g.*, *Shurtleff*, 596 U.S. at 248–55 (noting that City Hall was a "public forum"); *Walker*, 576 U.S. at 214 (considering how "license plates are not a traditional public forum for private speech"). *See also* Cong. Rsch. Serv., *Government Speech and Government as Speaker*, CONSTITUTION ANNOTATED. Critical to the public forum doctrine is that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

mandatory funding of beef commercials by private cattle merchants.  The Supreme Court held that the commercials in question were government speech, not compelled private speech, because the government "effectively controlled" their message.  *Id*.  This was so, the Supreme Court reasoned, because "the message set out in the beef promotions is from beginning to end the message established by the Federal Government."  *Id.* at 560–61.  "Thus, Congress and the Secretary have set out the overarching message and some of its elements, and they have left the development of the remaining details to an entity whose members are answerable to the Secretary."  *Id*. at 561.

Similarly, in *Summum*, the Supreme Court held that monuments in public parks, even those financed or donated by private parties, constituted government speech because the government has always exercised control and "final approval authority" over the selection of which monuments to place in a park.  555 U.S. at 472–73.  The Court emphasized how governments "have long used monuments to speak to the public," in fact "[s]ince ancient times." *Id.* at 470.  And in *Walker*, the Court applied *Summum* to specialty license plates in Texas and held that they, too, were government speech.  *Walker*, 576 U.S. at 209–10.  According to the Court, states, including Texas, have historically used plates for messaging, the public identifies them with the state, and Texas maintains "direct control" over their content. *Id.* at 210–13.  It did not matter much that "private parties take part in the design" of the specialty plates or that they convey countless messages.  *See id*. at 217 ("Texas's desire to communicate numerous messages does not mean that the messages conveyed are not Texas's own."); *id*. (stressing that the "holding in *Summum* was not dependent on the precise number of monuments found

within the park"); *see also id.* at 221 (Alito, J., dissenting) (noting over 350 specialty plates with distinct messages ranging from sports teams to religious organizations).

In contrast, in *Matal*, the Supreme Court held that trademarks were private and not government speech. 582 U.S. at 239. The Patent and Trademark Office ("PTO") had rejected Tam's trademark application related to his band, "THE SLANTS," which was intended to "reclaim" a "derogatory term for persons of Asian descent." *Id.* at 223, 228. The Court held that the state's rejection constituted viewpoint discrimination, not government speech because trademarks "have not traditionally been used to convey a Government message;" the government "does not dream up," edit, or meaningfully review trademarks; and the public does not associate trademarks with the government. *Id.* at 223, 235–38. The Court also noted how the PTO "made it clear that registration does not constitute approval of a mark." *Id*. at 237. *Matal* thus distinguished trademarks from the license plates in *Walker*, stating that *Walker* "likely marks the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at 238.

The Supreme Court likewise weighed the same factors to find private speech in *Shurtleff*. Boston had allowed private groups to raise flags outside its City Hall without denial or any control of flags' contents—that is, until 2017, when it rejected a group's "Christian flag." *Shurtleff*, 596 U.S. at 248. Like the PTO's rejection of the trademark in *Matal*, Boston's rejection of the flag constituted viewpoint-based discrimination. *Id.* Acknowledging that while the history of flying flags *generally* weighed toward finding government speech, the Court found that the history of Boston's *specific* flag-flying program was ambiguous, just like the public perception of who speaks through the city's

flagpole. *Id.* at 254–55. While Boston did fly its own flags outside City Hall, it had also allowed private groups to use the flagpole without reviewing or controlling those groups' flags. *Id.* The key issue was therefore government control. And because Boston never regulated any other flag's contents, the Court ruled that flag-flying outside the City Hall constituted private speech. Boston's control over the physical premises or over flag-raisings' schedule was insufficient. *Id.* at 256. Boston "could easily have done more to make clear it wished to speak for itself by raising flags," the Court observed, and it simply did not. *Id*. at 257–58.

Accordingly, while "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech," *see Summum*, 555 U.S. at 470, the Supreme Court is clear that the test to determine government speech is a "holistic" one. *Shurtleff*, 596 U.S. at 252. The "review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors." *Id*. Factors that are typically considered are the history of expression at issue, the perception of who is speaking, and the extent of governmental control over the expression. *Id.* If these factors show that the government is "engaging in [its] own expressive conduct, then the Free Speech Clause has no application." *Summum*, 555 U.S. at 467–68 (collecting cases).

## III.

Applying these principles with "great caution," *see Matal*, 582 U.S. at 235, we consider whether, under circumstances specific to California, CMEs eligible for Board credit constitute government speech. We hold that the

*Shurtleff* factors of history, public perception, and control weigh in favor of concluding that they are.

## A.

"The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients.  This is why there is a historical tradition of states restricting the medical practices health care providers can use, while not, for instance . . . preventing [lawyers] from discussing legal tax avoidance techniques."  *See Tingley v. Ferguson*, 47 F.4th 1055, 1083 (9th Cir. 2022) (emphasis in original) (cleaned up).  Indeed, "it has been the practice of different States, *from time immemorial*, to exact in" the medical profession "a certain degree of skill and learning upon which the community may confidently rely."  *Dent*, 129 U.S. at 122 (emphasis added); *see also Hawker v. New York*, 170 U.S. 189, 192–93 (1898) (upholding this authority as a "clear . . . proper exercise" of a state's police powers).  So rooted in tradition is this practice that the Supreme Court deemed it—in 1910—"too well settled to require discussion."  *Watson*, 218 U.S. at 176.

California, for its part, "has long regulated the practice of medicine as an exercise of the police power."  *Arnett v. Dal Cielo*, 923 P.2d 1, 2 (Cal. 1996) (recapping the history of the Board and the Medical Practice Act of 1876).  California's Medical Board has generally been "charged with the duty to protect the public against incompetent, impaired, or negligent physicians" since the 1870s.  *See id; Ex parte Gerino,* 77 P. 166, 168–69 (Cal. 1904) (upholding the Board's primordial requirements for practicing medicine).  And the Board has specifically and continually "adopt[ed] and administer[ed]" CME requirements since

1980.  *See, e.g.*, § 2190; 1980 Cal. Stat. ch. 1313 § 2
(ordering the Board to establish CME requirements); 2011
Cal. Stat. ch. 236 § 2 (authorizing the Board to set standards
for CMEs related to chronic diseases and lifestyle
behaviors); CCR tit. 16, § 1337.5 (1990) (outlining
standards); *id.* (2025) (same).  The Legislature, too, has
conceived of its own content requirements since 1992,
requiring that all credit-eligible CMEs at least (1) focus on
"scientific or clinical content" tied to patient care, cost-
effectiveness, public health, or preventative medicine;
(2) address quality assurance, risk management, facility
standards, or legal aspects of clinical practice; (3) relate to
bioethics or professional ethics; or (4) improve physician-
patient relationship.  *See* § 2190.1; 1992 Cal. Stat. ch. 331
§ 1.

The Legislature has since continued to expand CME
requirements.  *Compare Walker*, 576 U.S. at 211–12
(considering Texas's authorization of various plates'
messages over the past several decades).  Beginning 2001,
for example, the Legislature has ordered all physicians to
complete CMEs in pain management and the treatment of
the terminally ill, *see* §§ 2190.5–2190.6; 2001 Cal. Stat. ch.
518.  It has also required all general internists and family
physicians who treat a specific percentage of elderly patients
to complete training in geriatric medicine around the same
time.  *See* § 2190.3; 2000 Cal Stat. ch. 440.  All CMEs, since
2006, must also address cultural and linguistic competence
to be eligible for credit.  *See* § 2190.1(b)(1); 2005 Cal Stat.
ch. 514.

Conversely, the Legislature has excluded certain CMEs
from credit from 1992 to 2021.  During that time, licensees
could not earn credit for CMEs on medical office
management, billing, coding, and marketing, though the

Legislature now permits up to 30 percent of credit for these topics. *See* § 2190.15(i); 2021 Cal. Stat. ch. 612. Accordingly, California has not only long designated which CME courses qualify for credit, but also which courses do not.

The first factor of history therefore weighs decisively in favor of the State. There is no question that California has actively regulated the medical profession since the late nineteenth century, and the Board, in one way or another, has imposed qualifications on the practice of medicine ever since. It has also specifically adopted, updated, and enforced CME standards for almost half a century. Dr. Khatibi makes no particularized allegation to the contrary. She instead advances several arguments that either misunderstand the nature of the government speech inquiry or raise false alarms. None is availing.

Dr. Khatibi insists that CMEs have never been used to convey messages to the public. "At most," she argues, the CME scheme merely "shows that the government is communicating the importance of certain subjects to medical professionals," not the public. Dr. Khatibi also likens California with the PTO in *Matal*; both, in her view, have no history of "'dream[ing] up'" content for the speech at issue. *See* 582 U.S. at 235–39. Lastly, she says that looking to the lengthy regulatory history is "myopic" and improper because "the results would be sweeping" and susceptible to "'dangerous misuse.'" *See id.* at 235.

Dr. Khatibi's concerns are misplaced. It would be a serious affront to the Constitution if regulatory history alone were sufficient to immunize speech from First Amendment scrutiny. However, as the Supreme Court explained, history is but one factor in the context-driven, "holistic inquiry

designed to determine whether the government intends to speak for itself." *See Shurtleff*, 596 U.S. at 252; *Summum*, 555 U.S. at 484 (Breyer, J., concurring) ("[T]he 'government speech' doctrine is a rule of thumb, not a rigid category"). Indeed, it is precisely this "holistic inquiry" that serves as a bulwark against abuse.  It is also why Dr. Khatibi's arguments fail.  Just as we cannot equate something to monuments and conclude it is government speech, we cannot simply deem CMEs distinct from monuments and license plates, conclude they are nontraditional forms for government expression, and then terminate the inquiry.  To do so would begin and end the analysis at the mere "starting point." *See Shurtleff*, 596 U.S. at 255.

It bears repeating that our analysis "is driven by a case's context rather than the rote application of rigid factors." *Id.* at 252.  And the historical context of the implicit bias and other CME requirements *is* California's longstanding tradition of regulating the medical profession since the 1870s. *See, e.g.*, *Arnett*, 923 P.2d at 2–3.  California created the Board to combat the problem of quack doctors in the decades following the Gold Rush. *See Gerino*, 77 P. at 167; FROM QUACKERY TO QUALITY ASSURANCE 2–4.  The Board imposed basic qualifications on the practice of medicine since, and consistent with that history, eventually implemented and enforced the CME scheme in place for the past several decades. *See, e.g.*, *Gerino*, 77 P. at 167; 1980 Cal. Stat. ch. 1313 § 2.  If *Shurtleff*'s historical analysis examined flags' contents, materials, symbolism, location, and how frequently they were raised (including those of *England's* Windsor Castle), *see* 596 U.S. at 254, then looking to *California's history* of regulating the medical profession is not, as Dr. Khatibi contends, "myopic." Rather, it is the crystal-clear consideration compelled by the

"holistic inquiry designed to determine whether the government intends to speak for itself." *See id*. at 252; *compare Summum*, 555 U.S. at 470–72 (broadly considering the histories of various public parks and monuments, including pyramids).[5]

Moreover, Dr. Khatibi's claim that the CME requirements do not express the State's views rests on a fundamental misunderstanding of how government works. "'When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others.'" *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (quoting *Matal*, 582 U.S. at 234); *see also Walker*, 576 U.S. at 207–08 (exemplifying how a public vaccination program necessarily promotes vaccines while discouraging opposing perspectives). This is precisely why the government speech doctrine exists. For without it, government would cease to function. *See Summum*, 555 U.S. at 468; *accord Shurtleff*, 596 U.S. at 251. *See also Walker*, 576 U.S. at 207 ("How could a city government create a successful recycling program if officials . . . had to include . . . a long plea from the local trash disposal enterprise demanding the contrary?").

In other words, California's CME requirements necessarily reflect, as Dr. Khatibi effectively concedes, "the importance of certain subjects to medical professionals." The same holds true for California's lengthy history of

---

[5] Not all states share California's history or requirements. Colorado, for example, only began imposing CME requirements in 2024. *See* COLO. REV. STAT. § 12-240-130.5 (2024). It had expressly barred them until 2023. *See* COLO. REV. STAT. ANN. § 12-240-130(3) (2023). Montana and South Dakota, meanwhile, impose *no* CME requirements on physician-licensees. *See* MONT. CODE ANN. § 37-1-141 (2023); S.D. CODIFIED LAWS § 36-4-24.1 (2025).

regulation.  That history reflects the State's evolving judgment of what subjects it has deemed essential to "ensure the continuing competence of licensed physicians and surgeons," of which implicit bias is one. [6]  §§ 2190, 2190.1(d)(1).

Dr. Khatibi's assertion that there is no history of California "dreaming up" content for CMEs therefore has no footing in law or logic.  As discussed, the Legislature has specified CME content requirements—i.e., what it believes are vital for the continued competence of licensees—for decades.  *See, e.g.*, 1992 Cal. Stat. ch 331 § 1 (requiring, for example, that CMEs "[c]oncern bioethics"); 2005 Cal. Stat. ch. 514 § 2 (requiring all CMEs to address cultural and linguistic competence).  And the Board itself has long set requirements for CME faculty qualifications, course rationale, course content, course methodology, and even what must be on evaluation forms.  *See, e.g.*, CCR tit. 16, § 1337.5 (1990); *id.* (2002); *id.* (2025).

California thus sharply differs from the PTO in *Matal*. The PTO has no comparable history of telling companies like Sony to pick "'make.believe'" as its slogan from a list of qualified slogans.  *See Matal*, 582 U.S. at 235–37.  Nor has it ever commanded Apple how to, or who in its team

---

[6] Implicit bias certainly appears important to California beyond the CME context.  *See, e.g.*, 2020 Cal. Stats. ch. 317 § 2 (criticizing "[c]urrent law, as interpreted by courts" that tolerates "negative implicit biases" in criminal proceedings and creating the Racial Justice Act); CAL. HEALTH & SAF. CODE §§ 123630.1–123630.3 (identifying implicit bias as a driver of "health disparities in communities of color" and requiring perinatal hospitals to "implement evidence-based implicit bias programs).  Regardless of its merit, the implicit bias CME requirement thus aligns with California's other priorities and judgment—shaped by its electorate's "informed opinion."  *See Walker*, 576 U.S. at 207.

could, come up with "'Think different.'" *Id.* The PTO has also not ordered the noble patrons of Burger King to rate its motto of "'Have it your way.'" *Id.* Also, unlike the PTO, which long "made it clear that [trademark] registration does not constitute approval of a mark," *id.* at 237, the Board has never disclaimed approval of accredited CMEs. To the contrary, approved CMEs, like the grant or renewal of a medical license, has always reflected the Board's judgment of "the requisite skills and qualifications necessary to provide safe and effective services to the public"— something Dr. Khatibi does not contest.[7] *Rich Vision Ctrs. v. Bd. of Med. Exam'rs*, 192 Cal. Rptr. 455, 457 (Ct. App. 1983); *Shea v. Bd. of Med. Exam'rs*, 146 Cal. Rptr. 653, 659–60 (Ct. App. 1978). History thus squarely weighs in favor of finding government speech in this case.

---

[7] Dr. Khatibi's clarifies that her qualm with the implicit bias requirement is not "the subject matter mandated by the state in its regulatory capacity." Rather, it is that she is "being compelled to include irrelevant, controversial, and unhelpful speech" in the courses she teaches in her own "personal expressive capacity." But that puts the cart before the horse. Such reasoning short-circuits the government speech inquiry and assumes that CMEs are private speech from the get-go. Indeed, as counsel for Dr. Khatibi clarified and emphasized at oral argument, the "thorny issues" of compelled speech and viewpoint discrimination are actually "not before this court."

Setting aside that Dr. Khatibi is free to teach whatever she wishes in her own "expressive capacity," implicit bias *is* a "subject matter mandated by the state in its regulatory capacity." It is just like cultural competence or geriatric care topics the Legislature has required and content mandates with which Dr. Khatibi has admittedly complied. *See* §§ 2190.3, 2190.1(c)(1). As the Board explains, Dr. Khatibi's disagreement "with the particular subject of implicit bias does not change the nature of the expression."

## B.

"Next, then, we consider whether the public would tend to view the speech at issue as the government's." *Shurtleff*, 596 U.S. at 255. Unlike history, this factor presents a much closer call. Dr. Khatibi alleges that "attendees treat her as the person responsible for the content discussed." She is the sole organizer of her CMEs. Attendees often ask her questions during and after class; they even debate with her. They evaluate her as well, giving written feedback "about the effectiveness of the course and whether the course instructor possessed any bias." Section 2190.1(e)'s requirement that instructors provide examples or strategies relating to implicit bias, as Dr. Khatibi claims, could also lead attendees to further attribute CME content to her and not the State.

On the other hand, the Board asserts that the entire CME scheme exists for licensed medical professionals, not the public. It is apparent that licensees know that their profession is heavily regulated since they must comply with myriad requirements, including various CME mandates, to maintain their licenses. Dr. Khatibi's own allegation that "'physicians are unlikely to take' CMEs if they are not eligible for credit" bolsters this conclusion. All this, in the Board's view, means that licensees perceive CMEs' content as coming from the State.

Dr. Khatibi counters that "just because individuals understand that a CME course meets state requirements" does not mean that they perceive the CME as coming from the State. To so conclude, she cautions, risks equating accreditation or a mere "government seal of approval" with government speech, something deemed insufficient in *Matal*. Dr. Khatibi also details how CMEs can meet

requirements "so long as an individual course is first
approved by certain *private* organizations," and how CMEs
are "largely unsupervised by the government except for the
broad standards and a few mandated inclusions."

Both sides' arguments have some merit. Though some
of Dr. Khatibi's allegations border on conclusory, she has
plausibly alleged facts suggesting that attendees treat her as
the person responsible for CME content. She is also correct
that the State certainly expects, if not relies, on the
participation of private parties in executing the CME
scheme. *See, e.g.*, CCR tit. 16, § 1337.5(a). At the same
time, however, "the fact that private parties take part in the
design and propagation of a message does not extinguish the
governmental nature of the message." *Walker*, 276 U.S. at
217; *see Johanns,* 544 U.S. at 562. And private parties'
involvement alone, contrary to her contention, does not
resolve the government speech inquiry. Otherwise,
*Shurtleff*'s holistic inquiry would be a futile exercise, not a
vital mode of analysis designed to clarify the very "boundary
between government speech and private expression [that]
can blur." 596 U.S. at 252. Moreover, "[t]hat Plaintiffs are
evaluated and asked questions by course attendees—like
most educators—and must come up with 'examples' and
'strategies' related to implicit bias—a pedagogical technique
applicable to virtually any educational topic—does not alter
the reasonable inference that CME curriculum itself, when
approved for credit, is 'conveying some message on the
government's behalf.'" *Khatibi II*, 2024 U.S. Dist. LEXIS
81485, at *18 (citation omitted).

It also does not seem unreasonable to infer that licensees
perceive the content of accredited CMEs as coming from the
State based on Dr. Khatibi's own allegations. If physicians
are cognizant that their profession is heavily regulated (in

light of Dr. Khatibi's recognition of the multifaceted legal
and regulatory scheme in place); that they attend CMEs,
primarily to secure credits to maintain their licenses (given
Dr. Khatibi's allegation that licensees will not attend her
courses if they do not comply with state requirements); that
the Board requires licensees to take certain classes with
specific content (like about implicit bias); and only
compliant CMEs get credit (the very concern of
Dr. Khatibi's lawsuit), then "common sense" commands that
licensees could attribute approved CMEs' content to
California. *See Iqbal*, 556 U.S. at 679 ("Determining
whether a complaint states a plausible claim for relief . . .
requires . . . judicial experience and common sense.").

The Board's argument that the entire CME scheme was
created for licensees also has considerable force. As we
explained in the historical analysis, California created the
CME scheme "to ensure the continuing competence of
licensed physicians and surgeons." § 2190. This is far from
an effort to "intentionally open[] a nontraditional forum for
public discourse." *Cornelius*, 473 U.S. at 802. It is also a
far cry from *Shurtleff*, for example, where Boston generously
offered its flagpole "to the public for events" and
"accommodate[d] all applicants seeking to take advantage."
*See* 596 U.S. at 249.[8] Nor does the participation of private

---

[8] That only CMEs on qualifying topics and by approved providers can
receive credit is also evidence that they are not a *traditional* public
forum. *See Summum*, 555 U.S. at 478 ("The forum doctrine has been
applied in situations in which … government program was capable of
accommodating a large number of public speakers without defeating the
essential function of the … program."). "The obvious truth of the matter
is that if [CMEs] were considered to be traditional public forums," then
California would have to accommodate and accredit any CME taught by

parties change the analysis. "[P]ermitting limited discourse," much like "inaction," is insufficient to create a public forum. *Cornelius*, 473 U.S. at 802.

Considering the above, we conclude that, on balance, this factor tilts in California's favor.[9]

## C.

We next consider "the extent to which the government has actively shaped or controlled the expression," which is fundamental to the government speech inquiry. *Shurtleff*, 596 U.S. at 252. Alongside history, California's extraordinary control over accredited CMEs is the "most salient feature of this case." *Id*. at 256. Contrary to Dr. Khatibi's claims, California not only shapes the content of CMEs, but it also imposes several restrictions on their form and delivery. In short, it controls accredited CMEs "from beginning to end." *See Johanns*, 544 U.S. at 560–61.

We begin with the State's multifaceted CME statutory and regulatory scheme. *See Delano Farms Co. v. Cal. Table Grape Comm'n*, 586 F.3d 1219, 1230 (9th Cir. 2009) ("Our focus in this case . . . is the statutorily-authorized control the State has . . . and not the actual level of control evidenced in the record." (citing *Paramount Land Co. Ltd. P'ship v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1011 (9th Cir. 2007))). As discussed, section 2190 orders the Board to set and

---

anyone. *Id.* at 480. This would deprive California of the ability to select which courses are necessary to ensure licensees' competence, effectively "defeating the essential function of the … program." *Id.* at 478.

[9] Even assuming that the public perception factor favors Dr. Khatibi, our ultimate conclusion would remain the same. Consideration of the remaining factors of history and extent of state control decisively resolves the holistic government speech inquiry in favor of California.

enforce CME requirements on licensees. It also authorizes the Board to "set content standards for any educational activity concerning a chronic disease that includes appropriate information on prevention of the chronic disease, and on treatment of patients with the chronic disease, by the application of changes in nutrition and lifestyle behavior." *Id.* Section 2191, meanwhile, orders the Board to consider a plethora of subjects for accredited CMEs. These include, for instance, "human sexuality, defined as the study of a human being as a sexual being and how they function with respect thereto, and nutrition to be taken by those licensees whose practices may require knowledge in those areas;" child and elder abuse; "signs exhibited by abused women" in health settings; "special care needs of drug-addicted infants;" and "psychosocial dynamics of death." *See id.* § 2191(a)–(i). Other statutory provisions order the consideration of additional topics ranging from HIV prevention, mental health and trauma in children to chronic diseases, spousal abuse, and COVID-19. *See generally id.* §§ 2191.4–2191.6.

Section 2190.1(a), meanwhile, requires that all credit-eligible CMEs must "(1) have a scientific or clinical content with a direct bearing on the quality or cost-effective provision of patient care, community or public health, or preventive medicine, (2) concern quality assurance or improvement, risk management, health facility standards, or the legal aspects of clinical medicine, (3) concern bioethics or professional ethics, (4) are designed to improve the physician-patient relationship and quality of physician-patient communication," or otherwise "serve to maintain, develop, or increase the knowledge, skills, and professional performance that a physician and surgeon uses to provide care, or to improve the quality of care provided to patients."

*See* § 2190.1(a) (cleaned up); CCR tit. 16, § 1337.5(a)(3) (imposing similar content requirements).

All accredited CMEs must also address cultural and linguistic competence. Section 2190.1(c) meticulously lists topics that CMEs "shall address at least one or a combination of:"

> (A) Applying linguistic skills to communicate effectively with the target population.

> (B) Utilizing cultural information to establish therapeutic relationships.

> (C) Eliciting and incorporating pertinent cultural data in diagnosis and treatment.

> (D)(i) Understanding and applying culturally, ethnically, and sociologically inclusive data to the process of clinical care, including, as appropriate, information and evidence-based cultural competency training pertinent to the treatment of, and provision of care to, individuals who identify as lesbian, gay, bisexual, transgender, queer or questioning, asexual, intersex, or gender diverse. This includes processes specific to those seeking gender-affirming care services.

> (D)(ii) An evidence-based cultural competency training implemented pursuant to clause (i) may include all of the following:

>> (I) Information about the effects, including, but not limited to, ongoing personal effects of historical and

contemporary exclusion and oppression of transgender, gender diverse, or intersex (TGI) communities.

(II) Information about communicating more effectively across gender identities, including TGI-inclusive terminology, using people's correct names and pronouns, even when they are not reflected in records or legal documents, avoiding language, whether verbal or nonverbal, that demeans, ridicules, or condemns TGI individuals, and avoiding making assumptions about gender identity by using gender-neutral language and avoiding language that presumes all individuals are heterosexual, cisgender, or gender conforming, or nonintersex.

(III) Discussion on health inequities within the TGI community, including family and community acceptance.

(IV) Perspectives of diverse, local constituency groups and TGI-serving organizations including, but not limited to, the California Transgender Advisory Council.

(V) Recognition of the difference between personal values and professional responsibilities with regard to serving TGI people.

(VI) Recommendations on administrative changes to make health care facilities more inclusive.

The Legislature has also designated geriatric care as a mandatory CME topic for specific licensees.  § 2190.3.  So, too, are CMEs for pain management, treatment of terminally ill patients, and drug dependency.  *Id.* § 2190.5; *see also id.* § 2190.6 (providing alternative means of fulfilling § 2190.5's requirements).  Conversely, the statutory scheme delineates which CMEs are exempt from requirements or accreditation.  *See, e.g.*, *id.* § 2190.1(b)(2) (excluding CMEs "dedicated solely to research or other issues that does not include a direct patient care" and CMEs by out-of-state providers from cultural and linguistic competency requirements).

All these content-related requirements are in addition to the myriad other mandates imposed by the regulations.  Section 1337.5(a)(1) of title 16 of the regulations require CME instructors to possess specific qualifications, such as "a faculty appointment . . . directly related to the practice of medicine" in an approved institution.   The regulations dictate, too, that the "need for the course and how the need was determined shall be clearly stated and maintained on file;" that the content of the course address a list of specified topics; that each program "shall clearly state educational objectives that can be realistically accomplished within the framework of the course;" that the "teaching methods" be "described;" that each course shall include an evaluation; and that course organizers "maintain a record of attendance of each participant."  CCR tit. 16, § 1337.5(a)(2)–(5).

The regulations also provide that the "following programs are approved by the division for continuing

education credit: (1) Programs which qualify for Category I credit from the California Medical Association or the American Medical Association; (2) Programs which qualify for prescribed credit from the American Academy of Family Physicians; (3) Programs offered by other organizations and institutions acceptable to the division." CCR tit. 16, § 1337(a). "Only those courses and other educational activities that meet the requirements of Section 2190.1 of the code which are offered by these organizations shall be acceptable for credit under this section." *Id.* § 1337(b); *id.* § 1337(c)–(f) (detailing other limitations related to CMEs provided by these private organizations).

Additionally, the Board exercises final approval authority over the entire CME scheme. The Board "shall audit during each year a random sample of physicians who have reported compliance with the continuing education requirement." CCR tit. 16, § 1338(a); *id.* § 1338(b)–(e) (detailing related auditing, recordkeeping, and disciplinary processes). "When reviewing a physician's documentation for completed continuing education," as Dr. Khatibi notes, "the Medical Board will randomly audit CME courses to determine whether the course is approved for credit." "[A]ny course deemed unacceptable by" the Board receives no credit. *Id.* § 1337.5(c). The Board "in its discretion" may also waive the CME requirements for various reasons, including undue hardship. *Id.* § 1339(a).

What we have catalogued—perhaps painstakingly—reveals that California has not only provided a "general description" of CMEs but also "detail[ed] the themes to be emphasized, the actors to be used, the demographics to be targeted, and the media to be employed." *Paramount Land*, 491 F.3d at 1011 (finding government speech). It has also provided the starting and endpoint for any CME provider.

The State dictates who may teach the courses. CCR tit. 16, § 1337.5(a)(1); *id.* § 1337(a). It tells those qualified instructors to record their courses' purpose and teaching methodology as well as ensure that their courses address specific topics. *Id.* §§ 1337.5(a)(2)–(4). It also sets guidelines related to attendance and evaluation. *Id.* §§ 1337.5(a)(4)–(6). The Board may then audit, accredit, or reject the CME; it may also waive licensees' compliance obligations. *Id.* §§ 1337.5–1339. California therefore controls accredited CMEs "from beginning to end."[10] *See Johanns*, 544 U.S. at 560–61.

Dr. Khatibi resists this conclusion, but none of her arguments is persuasive. She first disputes California's control over the content of CMEs, emphasizing the role of private parties in the scheme. She also argues that unlike in *Summum*, where the city exercised "editorial control" of the monuments' messages, 555 U.S. at 472, and *Walker*, where Texas had "sole control" over license plates, 576 U.S. at 213, the Board's role of accreditation is one of "mere approval."

But as the Supreme Court explained, California's reliance on private organizations "does not extinguish the governmental nature of the message." *See Walker*, 276 U.S. at 202 (citing *Summum*, 555 U.S. at 470–471). California is

---

[10] Just as not all states share California's longstanding history with CME regulation, *see supra* note 5, many also do not appear to exercise a comparable level of control over CMEs. *Compare* California's § 2190–2190.6; *id.* §§ 2191–2191.6; *id.* §§ 2196–2196.9; CCR tit. 16, §§ 1336–1339.5, *with* MD. CODE ANN., HEALTH OCC. § 15-307 (imposing no comparable specific content requirements); MD. CODE REGS. § 10.32.01.10 (2025) (same); IND. CODE ANN. § 25-22.5-3-1 (2025) (imposing no CME requirements on physician-licensees); MONT. CODE ANN. § 37-1-141 (2023) (same); S.D. CODIFIED LAWS § 36-4-24.1 (2025) (same).

free to "le[ave] the development of the remaining details to an entity . . . answerable to the" Board, which is precisely what it has done. *See Johanns*, 544 U.S at 561. The State has outlined the topics that CMEs must cover. *See, e.g.*, § 2190.1. It has set who may and how to teach them. *See, e.g.*, CCR tit. 16, § 1337.5. It has also designated specific private organizations to deliver accredited CMEs, provided that the courses meet specific criteria. *See, e.g.*, *id.* § 1337. And the Board may ultimately audit and reject any CME as unacceptable. *See id.* § 1337.5(c). As in *Johanns*, this is sufficient, "effective[] control[]." 544 U.S at 560.

Relatedly, Dr. Khatibi's role as the "sole organizer" of a course does not mean that the State has exercised no control over content. To the contrary, Dr. Khatibi admits that her courses have complied with all CME requirements apart from the implicit bias one at issue in this case. Compliance presupposes a rule; without rules, there can be no compliance. Put another way, Dr. Khatibi has conceded that her CMEs *have* been shaped by California. They have aligned with the "overarching message" set by the State, even as California has "left the development of the remaining details" to her and other private parties. *See Johanns*, 544 U.S. at 561. Combined with the Board's auditing and ultimate approval authority, this *is* editorial control. *See id.* at 560–62.

For this reason, it is also of no moment that the Board normally accredits CMEs without an audit, *see* CCR tit. 16, § 1337.5(b), or that it has not yet chosen to audit Dr. Khatibi's courses. No one disputes that the Board may audit any course and deem it ineligible for credit. This, combined with the State's requirement that any accredited CME (which must be provided by specified, qualified providers) relate to at least a few, if broad, topics, *see, e.g.*, § 2190.1(a),

means that California shapes or controls CMEs "from
beginning to end." *See Johanns*, 544 U.S. at 560–61 (finding
sufficient governmental control where content was
"specified, *in general terms*" by Congress and where
Secretary had "final approval authority" (emphasis added)).

Neither would California's "passivity" have precluded a
finding of government speech here, in light of the relevant
expansive history and statutory and regulatory regime.  In
*Paramount Land*, we applied *Johanns* and found
government speech even where California "ha[d] not
rejected or edited proposals, or taken a particularly active
role." *See* 491 F.3d at 1011–12.  What is "dispositive" is
"the government's *ability* to control speech, even when it
declined to do so." *See Ranchers Cattlemen Action Legal
Fund United Stockgrowers of Am. v. Vilsack*, 6 F.4th 983,
990 (9th Cir. 2021) (emphasis in original) (citing *Paramount
Land*, 491 F.3d at 1011–12).

Dr. Khatibi's remaining arguments fare no better.  Her
claim that the sheer volume of accredited CMEs dilutes
California's control over them collapses under *Walker*'s
wisdom. *Walker* made clear that the "desire to communicate
numerous messages does not mean that the messages
conveyed are not" the government's.  576 U.S. at 217; *see
also id.* at 221–22 (Alito, J., dissenting) (noting that there are
over 350 varieties of specialty plates).  It is the state's right,
*Walker* stressed, to convey "many more messages" if it
wished. *Id.* at 217.  Citing *Summum*, the Court declared that
the government speech analysis was "not dependent on the
precise number of" expression or messages at issue. *Id.*
(citing 555 U.S. at 471–72).

*Shurtleff* reaffirmed this reasoning.  There, the court
clarified that it did "not settle [the] dispute by counting

noses—or, rather, counting flags. That is so for several reasons," including the more salient importance of focusing on Boston's policies, which were unwritten, and whether Boston "wished to speak for itself by raising flags." *See* 596 U.S. at 256–57. The fact that there may be numerous accredited CMEs, therefore, "does not mean that the messages conveyed are not [the government]'s own." *Walker*, 576 U.S. at 217.

More to the point, Dr. Khatibi makes no allegation of noncompliance. She does not allege that any accredited CME has somehow deviated from the Board's "overarching message," *see Johanns*, 544 U.S. at 561, of what is necessary to "ensure the continuing competence of licensed physicians and surgeons," *see* § 2190. In fact, all the sample CMEs Dr. Khatibi references align with state-mandated topics.[11] She accordingly fails to show that California has been "babbling prodigiously and incoherently" or "expressing contradictory views" through accredited CMEs—something that could have counseled toward finding private speech. *See Matal*, 582 U.S. at 235–36.

---

[11] *Compare* Opening Brief ("OB") 32 ("efficacy of endoscopic endonasal surgical navigation"), *with* § 2190.1(a)(2) (CMEs must "concern quality assurance or improvement … of clinical medicine"); OB 32 ("sexual orientation and gender identity in cardiovascular care"), *with* § 2191 (ordering the Board to consider "human sexuality" in licensees' practices) and § 2190.1(c) (listing cultural competency requirements touching on sexuality and gender); OB 26 (providing allegedly private speech example of CME called "Association Between the Relaxation of Public Health and Social Measures and Transmission of the SARS-CoV-2 Omicron Variant in South Korea"), *with* § 2190.1(a)(1) (CMEs must "have a scientific or clinical content with a direct bearing on the quality … of patient care, community or public health").

Second, Dr. Khatibi's comparisons of the Board to the governmental bodies in *Matal*, *Shurtleff*, *Summum*, and *Walker* are unpersuasive. The Board exercises far more control than the PTO in *Matal*. Indeed, the Board designates specific private organizations or qualified faculty to teach accredited CMEs. *See* CCR tit. 16, §§ 1337(a), 1337.5(a). These instructors' courses must at least adhere to the—in Dr. Khatibi's words—"broad parameters" set by California to be accredited. *See, e.g.*, § 2190.1. By contrast, the PTO imposes no similar requirements. Any natural or juristic person may create a mark, and they are able to do so from an entirely blank canvas. 15 U.S.C. § 1127. The PTO also "does not dream up" content standards, *Matal*, 582 U.S. at 235, whereas California has long done so, mandating that CMEs address topics like the "legal aspects of clinical medicine" and "health inequities within the TGI community, including family and community acceptance." *See, e.g.*, §§ 2190.1(a)(2), (c)(1)(D)(ii)(III).

The PTO normally "does not inquire whether any viewpoint conveyed by a mark is consistent with Government policy," and it lacks authority to remove the mark absent very specific and limited circumstances. *Matal*, 582 U.S. at 235. In contrast, the Board may audit and revoke the accreditation of any CME that fails to comply with its "acceptability" criteria, including content requirements. *See* § 1337.5(c). Also unlike the PTO, which "has made it clear that registration does not constitute approval of a mark," *Matal*, 582 U.S. at 237, the Board's accreditation reflects its judgment that a CME's content is essential to "ensure the continuing competence" of licensees. § 2190.

California's oversight over CMEs dwarfs the nominal supervision by the cities in *Shurtleff* and *Summum*, too. In *Shurtleff*, Boston "hadn't spent a lot of time really thinking

about" the flags it permitted to fly and "had nothing—no written policies or clear internal guidance." 596 U.S. at 257 (cleaned up). Similarly, in *Summum*, Pleasant Grove lacked a written policy on monuments until a year after the plaintiffs donated the monument at issue. 555 U.S. at 465. And even then, the city's eventual policy seemed limited in nature. *Id.* (detailing the policy's focus on historical ties to the community). California's CME regime, in contrast, has long been embedded in and enforced through a complex web of statute and regulation. *See, e.g.*, § 2190.1; CCR tit. 16, § 1337.5. It is also significant that both the monument in *Summum* and the flag in *Shurtleff* were entirely privately designed, with no government input whatsoever. The content of accredited CMEs, as we have detailed, is shaped by the State from their inception.

*Walker* also undercuts, rather than reinforces, Dr. Khatibi's claims. It is true that *Walker* emphasized how Texas had "sole control over the design, typeface color, and alphanumeric pattern for all license plates." 576 U.S. at 213. But the Court also highlighted that its analysis—like ours—was holistic. *See id.* at 210–13. The Board's lack of the same granular control over every element of accredited CMEs is thus inconsequential. The Board need not micromanage the drawing board or the classroom for accredited CMEs to count as government speech. Much like Texas, the Board, for decades, has "'effectively controlled,'" them "by exercising 'final approval authority,'" *id.* at 213, and by dictating content standards, pedagogical frameworks, and instructor qualifications. *See, e.g.*, § 2190.1; CCR tit. 16, § 1337.5. To otherwise hold "risks micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake." *See Paramount Land*, 491 F.3d at 1012.

\*       \*       \*

We hold that CMEs eligible for credit under California law constitute government speech. *See Shurtleff*, 596 U.S. at 248. And because they constitute government speech, CMEs eligible for credit are therefore immune from the strictures of the Free Speech Clause. *See Summum,* 555 U.S. at 464.[12]

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox…." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This star yet shines. Just as California cannot compel Plaintiffs to teach subjects against their beliefs in their private capacities, Plaintiffs cannot compel California to speak against its own in its official capacity as guardian against "quacks and pretenders and from the mistakes of incapable practitioners." *Gerino*, 77 P. at 167.

**AFFIRMED.**

---

[12] Accordingly, we need not reach Plaintiffs' unconstitutional conditions claim. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 214 (2013) ("[T]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." (cleaned up)); *see also Matal*, 582 U.S. at 239–40 (suggesting that the doctrine only applies to "cash subsidies or their equivalent").